UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
LIGHTON INDUSTRIES, INC.,

     *Plaintiff*,

-against-                                    **MEMORANDUM & ORDER**

ALLLIED WORLD NATIONAL ASSURANCE            16-CV-3812(KAM)(SMG)
COMPANY and MT. HAWLEY INSURANCE
COMPANY,

     *Defendants*.
---------------------------------X
---------------------------------X
HIBUILD LIMITED LIABILITY COMPANY,

     *Plaintiff*,

                           16-CV-5302(KAM)(SMG)

-against-

MT. HAWLEY INSURANCE COMPANY,

     *Defendant*.
---------------------------------X
**MATSUMOTO, United States District Judge:**

       Presently before the court are the parties' cross-
motions for summary judgment in *Lighton Industries Inc. v.
Allied World National Assurance Company et al.*, case number 16-
CV-3812 (the "*Lighton* Action") and *Hibuild LLC v. Mt. Hawley
Insurance Company*, case number 16-CV-5302 (the "*Hibuild*
Action"), which have been consolidated pursuant an order issued
February 2, 2017 by the Honorable Steven M. Gold, United States

Magistrate Judge.[1]  (*See* Minute Entry, ECF No. 20.)  Both actions relate to the applicability of insurance coverage to an alleged accident on the campus of Brooklyn College on August 16, 2014. Also before the court are an objection to, and a motion to strike, a late-filed Local Rule 56.1 statement, and a motion to authorize the filing of the same statement.

Plaintiff Lighton Industries, Inc. ("Lighton") seeks summary judgment on its claims for declaratory judgment that defendants Allied World National Assurance Company ("Allied") and Mt. Hawley Insurance Company ("Mt. Hawley," and together with Allied, "defendants") have a duty to defend Lighton and a duty to indemnify Lighton with respect to litigation and potential liability arising from the alleged accident.  (Lighton Memorandum in Support of Motion for Summary Judgment ("Lighton Mem."), ECF No. 25-1, at 1-2.)

Plaintiff Hibuild Limited Liability Company ("Hibuild," and together with Lighton, "plaintiffs") seeks summary judgment that Mt. Hawley has a duty to defend Hibuild in the same litigation, but does not seek summary judgment regarding indemnification, as Hibuild concedes that issue is not ripe.  (Hibuild Memorandum in Support of Motion for Summary

---

[1]    Because the court has consolidated these cases, most relevant documents have been filed on the docket of the *Lighton* Action.  Accordingly, citations to ECF filings are to the *Lighton* Action unless otherwise indicated.  Where a citation is to an ECF filing in the *Hibuild* Action, the document is identified as "ECF/*Hibuild* No. __."

Judgment ("Hibuild Mem."), ECF No. 27-1, at 1 and n.1.)

Conversely, defendants seek summary judgment that they do not

have any duty to defend or indemnify plaintiffs.  (Allied

Memorandum in Support of Motion for Summary Judgment ("Allied

Mem."), ECF No. 23-1, at 1; Mt. Hawley Memorandum in Support of

Motion for Summary Judgment ("Mt. Hawley Mem."), ECF No. 24-14,

at 1-2.)

Additionally, Allied objects to, Mt. Hawley seeks to

strike, and Lighton seeks to have the court receive and

consider, Lighton's belatedly-filed Amended Local Rule 56.1

Statement of Undisputed Material Facts.  (*See* Allied Objection

to Lighton Amended 56.1 Statement, ECF No. 50; Mt. Hawley Motion

to Strike Lighton Amended 56.1 Statement, ECF No. 51.)  Lighton

filed this statement with its reply papers, in response to

Allied and Mt. Hawley's observations that Lighton's initial

Local Rule 56.1 statement did not comply with Local Rule 56.1.

(*See* Lighton Amended Rule 56.1 Statement, ECF No. 49-1; Allied

Rule 56.1 Counter-statement, ECF No. 26-1; Mt. Hawley Rule 56.1

Counter-statement to Lighton, ECF No. 28.)

## Background

### I.   Factual Background

Except as indicated, the following undisputed facts

are drawn from the parties' statements of undisputed material

facts pursuant to Local Rule 56.1, and the supporting exhibits

set forth in the parties' joint stipulation as to exhibits applicable to all motions ("Joint Stip." or the "joint stipulation," ECF No. 22).

### A. Plaintiffs and Relevant Third Parties

This action relates to a masonry repair project (the "James Hall Repairs") at Brooklyn College's William James Hall, a five-story building located at 2900 Bedford Avenue, Brooklyn, New York ("James Hall"). (Mt. Hawley Requests for Admission ("Mt. Hawley RFA"), Joint Stip. Ex. A, ECF No. 22-1, No. 1, 7-8, 11-12; Lighton Responses to Mt. Hawley RFA ("Lighton RFA Resp."), Joint Stip. Ex. B, ECF No. 22-2, No. 1, 7-8, 11-12; Hibuild Responses to Mt. Hawley RFA ("Hibuild RFA Resp."), Joint Stip. Ex. C ECF No. 22-3, No. 1, 7-8, 11-12.)

Lighton and Hibuild are both construction companies involved in the James Hall Repairs. Specifically, the Dormitory Authority of the State of New York ("DASNY") retained Lighton to serve as general contractor for the James Hall Repairs. (Mt. Hawley RFA No. 15; Lighton RFA Resp. No. 15; Hibuild RFA Resp. No. 15.) Lighton, in turn, retained Hibuild to serve as subcontractor and/or project manager. (Mt. Hawley RFA Nos. 16-17 (asserting Hibuild was subcontractor or project manager); Lighton RFA Resp. Nos. 16-17 (admitting Hibuild was subcontractor); Hibuild RFA Resp. Nos. 16-17 (admitting Hibuild was Project Manager).) Additionally, Hibuild retained non-party

Rock Scaffolding Corporation ("Rock") to serve as a

subcontractor.[2]  (Mt. Hawley RFA No. 18; Lighton RFA Resp. No.

18; Hibuild RFA Resp. Nos. 18.)

The specific contractual arrangements involving DASNY,

Lighton, Hibuild, and Rock are as follows: on December 14, 2012,

Lighton entered into a construction contract with the Dormitory

Authority of the State of New York ("DASNY").  (*See* Contract,

Joint Stip. Ex. F, ECF No. 22-6.)  The contract referenced a job

order and required Lighton to, in relevant part, "perform the

tasks required by each individual Job Order issued pursuant to"

the contract.  (*Id.* at 1.)  DASNY subsequently issued a job

order on November 5, 2013 calling for Lighton to carry out

"[c]ornice repair" at James Hall building (*i.e.*, the James Hall

Repairs).  (Job Order, Joint Stip. Ex. G, ECF No. 22-7, at 002.)

More specifically, Lighton was to "[p]rovide the labor[] and

equipment to remove and replace the deteriorated areas on . . .

the James Hall Building on the south, north, and east sides."

(*Id.* at 004.)[3]

On December 21, 2012, Lighton entered into a

subcontracting agreement with Hibuild for the James Hall

---

[2]    Rock is apparently now known as "R.S.C. of NY Corp."  (*See*, *e.g.*, Mt.
Hawley RFA No. 2; Lighton RFA Resp. No. 2; Hibuild RFA Resp. No. 2.)
Consistent with the parties' papers in the instant actions, this Memorandum
and Order refers to the entity as "Rock."
[3]    Page number references in citations to the Job Order are to the numbers
Bates-stamped on the document.

Repairs.  (*See* Subcontracting Agreement, Joint Stip. Ex. H, ECF
No. 22-8.)  The subcontracting agreement called for Hibuild to
"provide all necessary equipment, material and labor to complete
all work as per individual work orders issued under DASNY JOC
Contract 173254/CR276" (Subcontracting Agreement Art. 8), which
the DASNY Job Order indicates is the contract between Lighton
and DASNY relevant to this action.  (*See* Job Order at 002.)[4]

Hibuild, in turn, entered into a subcontracting
agreement with Rock.  The agreement states that it is "[f]or the
following Project: JOB ORDER CONTRACT REGION-1 CONTRACT NO.
173254CR276."  (Rock-Hibuild Subcontracting Agreement, Joint
Stip. Ex. J, ECF No. 22-10, at 1.)  Further, pursuant to the
agreement between Rock and Hibuild, Rock was to "[p]rovide all
Plant, Labor, Material, Equipment, tools and supervision
(English speaking) necessary to perform work outlined in
individual Work Order also known as Individual Job Order [sic]."
(*Id.* Art. 8.)

---

[4]    Additionally, Lighton and Hibuild are parties to an indemnity
agreement, dated December 27, 2012, pursuant to which Hibuild agreed that it
would

> [t]o the fullest extent permitted by law . . . indemnify
> and hold harmless [Lighton] . . . from and against all
> claims, damages, losses and expenses . . . arising out of
> or resulting from the performance of [Hibuild's] [services,
> labor or materials] . . . provided that such claim, damage,
> loss or expense is . . . cause[d] in whole or in part by
> any negligent or willful act or omission of [Hibuild], any
> sub-subcontractor of [Hibuild], anyone directly or
> indirectly employed by any of them or anyone for whose acts
> any of them may be liable.

(Indemnity Agreement, Joint Stip. Ex. I, ECF No. 22-9, ¶ 1.)

**B.    The James Hall Repairs**

James Hall is a five-story building with brick pillars lining the exterior walls.  (Mt. Hawley RFA Nos. 1, 5, 7-8, 11-12; Lighton RFA Resp. Nos. 1, 5, 7-8, 11-12; Hibuild RFA Resp. Nos. 1, 5, 7-8, 11-12.)

As noted above, the Job Order between DASNY and Lighton for the James Hall Repairs stated that the project involved, *inter alia*,  "cornice repair" on the exterior of the building (Job Order, Joint Stip. Ex. G, at 002), but Lighton and Hibuild both deny that the Project actually involved repairs to a cornice on the exterior of James Hall.  (Mt. Hawley RFA No. 6; Lighton RFA Resp. No. 6; Hibuild RFA Resp. No. 6.)  The parties agree that the James Hall Repairs also involved masonry patching work on the exterior of the building, repointing and/or restoration of the brick pillars on the exterior walls, and the erection of a scaffold that scaled the full height, *i.e.* five stories, of the building on at least one of its sides.  (Mt. Hawley RFA Nos. 4, 5, 7, 8; Lighton RFA Resp. Nos. 4, 5, 7, 8; Hibuild RFA Resp. Nos. 4, 5, 7, 8.)  Notably, the James Hall Repairs involved no interior work.  (Mt. Hawley RFA No. 9; Lighton RFA Resp. No. 9; Hibuild RFA Resp. No. 9.)

**C.    The Insurance Policies**

Allied and Mt. Hawley are both insurance companies. Allied issued one insurance policy, and Mt. Hawley issued two insurance policies, relevant to the instant action.

**1.    The Allied Policy**

Allied issued Policy No. 5050-0003 (the "Allied Policy") to Lighton for the policy period of April 14, 2014 to April 14, 2015.  (Allied Policy, Joint Stip. Ex. RR, ECF No. 22-52.)  The Allied Policy includes a coverage limit of $1,000,000 per occurrence and, as well as a $2,000,000 "General Aggregate Limit."  (*Id.* at AW000241.)[5]  By endorsement, the named insured under the Allied Policy was amended to include both Lighton and Lighton Electric, Inc.  (*Id.* at AW000247.)

Additionally, the Allied Policy contains an endorsement that creates an exclusion for work by "uninsured or underinsured subcontractors" (the "Subcontractor Exclusion"). (*See id.* at AW000312-13.)[6]  The Subcontractor Exclusion provides as follows:

> *Solely with respect to operations or work performed in the State of New York*, **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** is amended to include the following additional exclusion:

---

[5]    Page number references in citations to the Allied Policy are to the page numbers Bates-stamped on the document.
[6]    The Bates numbering in the exhibit that contains the Allied Policy is not consecutive.  Pages AW000312-13 correspond to ECF pages 74 and 75 of 90.

This insurance does not apply to:

**Work Done On Your Behalf By Uninsured or Underinsured Subcontractors**

Any claim, "suit", demand or loss that alleges "bodily injury" to any "worker" that in any way, in whole or in part, arises out of, relates to or results from operations or work performed on your behalf by a subcontractor, unless such subcontractor:

(1) Has in force at the time of such injury or damage a Commercial General Liability insurance policy and an Excess Liability insurance policy that:

   (a) names you as an additional insured and such insurance afforded you will be primary to, and non-contributory with, any other insurance available to you;

   (b) provides limits of liability equal to or greater than:

        Commercial General Liability Limits:

        General Aggregate Limit (Per Project) $2,000,000,
        Products Completed Operations Aggregate Limit $2,000,000,
        Each Occurrence Limit $1,000,000,
        Personal & Advertising Injury Limit $1,000,000, and

        Excess Liability Limits:

        Each Occurrence Limit $1,000,000, and
        Aggregate Limit (Per Project) $1,000,000; and

   (c) covers such claim, "suit", demand or loss; and

(2) Has agreed in writing to defend, indemnify and hold harmless the Named Insured and any other insured under the policy for any claim or "suit"

> for "bodily injury" to any "worker" arising out
> of the work performed by such Subcontractor.

(*Id.* at AW000312 (bold and italic text in quoted material).)

### 2. The Mt. Hawley Policies

Mt. Hawley issued two insurance policies to Hibuild that are relevant to the instant action. The first, Commercial General Liability Policy No. MGL0177275 (the "Mt. Hawley CGL Policy," Joint Stip. Ex. O, ECF No. 22-15), was issued for the period November 19, 2013 to November 19, 2014. The Mt. Hawley CGL Policy, in relevant part, provided coverage for bodily injury liability subject to a $2 million general aggregate limit, $1 million per-occurrence limit, and a $1 million products-completed operations limit. (*Id.* at MH002278.)[7]

The second, Excess Liability Policy No. MXL0418432 (the "Mt. Hawley Excess Policy," Joint Stip. Ex. Q, ECF No. 22-25), was issued for the same coverage period. The Mt. Hawley Excess Policy provides that it applies, in relevant part, "(a) only in excess of the underlying insurance; [and] (b) only after the underlying insurance has been exhausted by payment of the limits of liability of such insurance." (*Id.* at MH000300.) Its general aggregate limit, per-occurrence limit, and products-

---

[7]  Page number references in citations to the Mt. Hawley CGL Policy and Mt. Hawley Excess Policy (as defined herein) are to the page numbers Bates-stamped on the document.

completed operations limit are each $2 million.  (*Id.* at MH 000297.)

### a.    The Classification Limitation

The Mt. Hawley CGL Policy contains an endorsement setting forth a classification limitation (the "Classification Limitation"),[8] which provides that

> [t]his insurance applies only to "bodily injury," "property damage" and/or "personal and advertising injury" resulting from the Classification or Operations as per application: [Hibuild's] operations as a General Contractor with incidental exterior work not to exceed two stories.

(Mt. Hawley CGL Policy at MH002299.)

The first page of the Mt. Hawley CGL Policy states that Hibuild's classification is "GC – Interior Renovation" (*id* at MH002278), and Hibuild's application materials made several representations regarding the nature of Hibuild's operations. For instance, in a "Contractors Supplemental Application," Hibuild described its operations as consisting of "[i]nterior retrofitting."  (Hibuild Contractors Supplemental Application, Joint Stip. Ex. P(1), ECF No. 22-16, at RSG-000017.)[9]  The same

---

[8]    A limitation is distinct from an exclusion in that "classification limitations of coverage merely define the activities that [a]re included within the scope of coverage 'in the first instance,' and do not constitute exclusions from coverage that would otherwise exist."  *Black Bull Contracting, LLC v. Indian Harbor Ins. Co.*, 23 N.Y.S.3d 59, 61 (N.Y. App. Div. 2016) (quoting *Worcester Ins. Co. v. Bettenhauser*, 734 N.E.2d 745, 747 (N.Y. 2000)).

[9]    Page number references in citations to Exhibit P to the parties' joint stipulation and its sub-exhibits (*e.g.*, P(1), P(2)) are to the page numbers Bates-stamped on the document.  Additionally, and as explained in greater

document also indicated that Hibuild performed no work over two (2) stories in height from grade (other than interior only)," and indicated that Hibuild had zero payroll costs or subcontract costs for any work involving "Exterior Restoration," "Façade Work," "Masonry," "Plastering," or "Siding/Windows," and that all of its work over the coming 12-month period would consist of "Carpentry," "Electrical," "Maintenance," "Mechanical," "Painting," "Plumbing," and "Supervisory" work. (*Id.* at RSG-000018-19.)

Hibuild also submitted a Commercial Insurance Application to Mt. Hawley that described Hibuild's business as "Commercial Contractor – Carpentry" (Hibuild Commercial Insurance Application, Joint Stip. Ex. P(1) at RSG-000022), and a "Schedule of Hazards" in a document titled "Commercial General Liability Section" lists only "GC – Interior Renovation." (*Id.* at RSG 000025.)[10]

In responding to Mt. Hawley's requests for admission, Hibuild admitted that the signatures on the "Commercial Insurance Application" and "Contractors' Supplemental Application" documents annexed to Mt. Hawley's requests for

detail in note 11 below, the record contains at least two other copies of this application: one is in Exhibit P(2) (ECF No. 22-17) beginning at page RSG-000273, and another is in Exhibit A.

[10]     Like the Contractor's Supplemental Application, the Commercial Insurance Application and "Commercial General Liability Section" documents appear at least two other times in the record. The first additional instance is in Exhibit P(2) at RSG-000278-84, and the second is in Exhibit A, as discussed in note 11 below.

admission[11] "appear[] to be th[ose] of [Hibuild's] Vice President," but otherwise declined to admit or deny the documents' authenticity. (Hibuild RFA Resp., Joint Stip. Ex. C, Nos. 26-27.) Hibuild also stated that it "has no recollection of ever seeing, submitting, or causing to be submitted" either document "in connection with [Hibuild's] 2013 insurance application." (*Id.*)

> **b.   *The Designated Ongoing Operations Exclusion***

The Mt. Hawley CGL Policy also contains an endorsement setting forth an exclusion for "Designated Ongoing Operations" (the "Designated Ongoing Operations Exclusion"), which provides that the Mt. Hawley CGL Policy does not apply to "'bodily injury' or 'property damage' arising out of the ongoing operations described in the Schedule of th[e] endorsement." (*Id.* at MH002305.) The schedule, in turn, designates "[e]xterior work/projects above 2 stories" as ongoing operations within the Designated Ongoing Operations Exclusion. (*Id.*)

---

[11]     The Commercial General Liability Section, Commercial Insurance Application, and Contractor's Supplemental Application documents annexed to Mt. Hawley's requests for admission are substantially identical to those in Exhibit P(1) to the parties' Joint Stipulation. (*Compare* Mt. Hawley RFA Ex. 6-8, Joint Stip. Ex. A, at ECF pp. 50-64 *with* Joint Stip. Ex. P(1) at RSG-000017-28.) The only difference is that page two of the Commercial Insurance Application as annexed to Mt. Hawley's requests for admission is signed, but the version included in Exhibit P(1) is not; the documents are otherwise identical in all respects. (*Id.*) For ease of reference, the court cites to the documents contained in Exhibit P(1) to the Joint Stipulation with the understanding that the Commercial Insurance Application was signed, as Exhibit A includes multiple exhibits and is not consecutively paginated throughout.

### c. Incorporation into Mt. Hawley Excess Policy

The Mt. Hawley Excess Policy provides that it "is subject to all of the conditions, agreements, exclusions, and limitations of and shall follow the underlying insurance in all respects . . . includ[ing] changes by endorsement." (Mt. Hawley Excess Policy at MH000300.) Therefore, the Classification Limitation and the Designated Ongoing Operations Exclusion are incorporated into the Mt. Hawley Excess Policy.

### D. The Tunkara Action

On November 3, 2014, Mr. Babalemmeh Tunkara ("Tunkara") filed a notice of claim (the "Notice of Claim," Joint Stip. Ex. L, ECF No. 22-12) against DASNY asserting that, while working on James Hall on August 16, 2014 as an employee of Rock, he "was walking down a ladder from scaffold [sic] and was injured from his fall from said ladder." (Notice of Claim at 2.) On October 13, 2015, Tunkara filed a Summons and Verified Complaint (the "Tunkara Complaint") in the Supreme Court of New York, Kings County (the "State Court"), thereby commencing an action captioned *Babalemmeh Tunkara v. Dormitory Auth. of State of N.Y., Lighton Indus., Inc., and Hibuild LLC*, and assigned Index Number 12345/2015 (the "Tunkara Action").[12] (*See* Tunkara

---

[12]    In November 2014, prior to commencing the Tunkara Action, Tunkara filed a Notice of Claim directed to DASNY and relating to the same subject matter as the Tunkara Action, as described more fully below. (*See* Tunkara Notice of Claim, Joint Stip. Ex. L, ECF NO. 22-12.)

Action Summons and Verified Complaint, Joint Stip. Ex. M, ECF No. 22-13.)

In the Tunkara Action, Tunkara alleges that he was injured on August 16, 2014, while the Allied and Mt. Hawley policies were in effect, when he sustained a fall while walking down a ladder from a scaffold in the course of his employment by Rock, while working on the James Hall Repairs. (Mt. Hawley RFA Nos. 1-3; Lighton RFA Resp. Nos. 1-3; Hibuild RFA Resp. Nos. 1-3; *see also* Tunkara Action Complaint at ¶¶ 70-72; *see also* Notice of Claim at 2.)

After commencing the Tunkara Action, and upon a demand by DASNY, Tunkara filed a Verified Bill of Particulars (the "Bill of Particulars," Joint Stip. Ex. N, ECF No. 22-14) with the State Court. According to the Bill of Particulars by Tunkara, the "subject occurrence took place on August 16, 2014 at approximately 1:00 p.m. . . . in front of [James Hall], on the left side, as one is facing the building, at the corner where the side and front of the building meet." (Bill of Particulars ¶¶ 1-2.) Further, the Bill of Particulars asserts that DASNY "by and through [its] agents . . . [was] negligent: in that [it] . . . fail[ed] to provide proper and/or adequate ladder and scaffolding for [Tunkara] to climb down from an elevated area" and "fail[ed] to properly secure the ladder which

plaintiff was using to climb down from an elevated area." (*Id.* ¶ 3.)

The Notice of Claim, the Tunkara Action Complaint, and the Bill of Particulars are all silent as to (1) the specific floor on which Tunkara was (or to which he was level) at the time of his fall, (2) the nature of the James Hall Repairs, and (3) the extent to which the James Hall Repairs involved exterior work relative to the extent to which it involved interior work. As noted above, however, Lighton and Hibuild admitted in their responses to Mt. Hawley's requests for admission that the James Hall Repairs were entirely comprised of exterior work and involved no interior work.

Based on these allegations, the Tunkara Action Complaint asserts claims, in each case against DASNY, Lighton, and Hibuild, for negligence (Tunkara Action Complaint ¶¶ 1-91), violation of section 200 of the New York Labor Law (*id.* ¶¶ 92-94), violation of section 240(1) of the New York Labor Law (*id.* ¶¶ 95-98), and violation of section 241(6) of the New York Labor Law. (*Id.* ¶¶ 99-102). The Tunkara Action Complaint does not state the amount of damages that Tunkara seeks, but Tunkara's Notice of Claim states that he seeks damages of $2,000,000. (Notice of Claim at 4.)

### E.  Defense and Indemnification Requests

In December 2014, after Tunkara filed his Notice of Claim, but before he commenced the Tunkara action, DASNY sent Allied a letter (the "DASNY Demand Letter") informing Allied of the Notice of Claim.  (*See* DASNY Demand Letter, Joint Stip. Ex. MM, ECF No. 22-47.)  The letter is dated December 12, 2014, but it is not clear when Allied received the letter.  (*Id.* at 1.)  In the letter, DASNY noted that Lighton was Allied's insured, and that Lighton was "obligated, pursuant to [its] contract [with DASNY] to obtain primary insurance coverage on behalf of DASNY and the City University of New York."  (*Id.* at 1.)  DASNY thus demanded that Allied "assume the defense and agree to indemnify and hold harmless DASNY and the City University of New York . . . as additional insureds on the [Allied Policy]."  (*Id.*)

Also in December 2014, after DASNY sent the DASNY Demand Letter to Allied, Rockville Risk Management ("RRM"), Allied's third party claim administrator, sent Mt. Hawley a letter on behalf of Lighton seeking defense and indemnification.  (*See* RRM Request Letter, Joint Stip. Ex. U, ECF No. 22-29.)  The letter is dated December 23, 2014, and is stamped as received as of December 29, 2014.  (*Id.* at 1.)

In January 2015, Mt. Hawley sent several letters denying coverage for the Tunkara Claim and citing, in relevant

part, the Designated Ongoing Operations Exclusion. (*See* January 7, 2015 Letter, Joint Stip. Ex. S, ECF No. 22-27 (disclaiming coverage to Hibuild, with copies to other party and non-party entities); January 9, 2015 Letter, Joint Stip. Ex. T, ECF No. 22-28 (same); January 8, 2015 Letter, Joint Stip. Ex. V, ECF No. 22-30 (asserting to RRM that Mt. Hawley has no duty to defend or indemnify Lighton or its indemnities); January 9, 2015 Letter, Joint Stip. Ex. W, ECF No. 22-31 (same).) Each of the letters also expressly reserved all other defenses to coverage. (*Id.*) Following Mt. Hawley's denial of coverage, on March 17, 2015, Allied, through RRM, sent a letter to Lighton denying coverage for the Tunkara claim based on the Subcontractor Exclusion. (Allied Claim Denial Letter, Joint Stip. Ex. KK, ECF No. 22-45.)

By letter dated November 23, 2015, after the Tunkara Action was initiated, RRM, on behalf of Lighton, its indemnities (which the letter does not identify), and Allied, sent Mt. Hawley a demand for defense and indemnification in the Tunkara Action. (RRM Demand Letter, Joint Stip. Ex. AA, ECF No. 22-35.) On November 30, 2015, Mt. Hawley responded with an e-mail acknowledging receipt of RRM's tender and stating that "Mt. Hawley maintains its position as outlined in [its] attached correspondence dated January 8, 2015, and January 9, 2015," *i.e.*, that Mt. Hawley owed no duty to defend or indemnify any party under any policy. (Mt. Hawley Denial E-Mail, Joint Stip.

Ex. BB, ECF No. 22-36.)  On December 9, 2015, RRM sent Lighton a
letter on behalf of Allied denying coverage for the Tunkara
Action based on the Subcontractor Exception.  (Allied Action
Denial Letter, Joint Stip. Ex. LL, ECF No. 22-46.)

## II. Procedural History

These actions followed Allied and Mt. Hawley's denials
of coverage.  On May 27, 2016, Lighton filed a complaint in New
York State Court (the "*Lighton* Complaint") seeking declaratory
judgment that Allied and Mt. Hawley have a duty to defend and
indemnify it under the Allied Policy and the Mt. Hawley CGL
Policy.  (*See Lighton* Complaint, ECF No. 1-2, at 1-2.)[13]  The
*Lighton* Complaint also asserts a "bad faith" claim against Mt.
Hawley.  (*Id.* at 5-6.)  Allied removed the *Lighton* Action to
this court on July 8, 2016, based on 28 U.S.C. §§ 1332 and 1446.
(*See generally* Notice of Removal, ECF No. 1.)

Separately, on September 23, 2016, Hibuild filed an
action in this court, assigned case number 16-CV-5302, against
Mt. Hawley and Atlantic Casualty Insurance Company ("ACIC").
(*See* Complaint (the "*Hibuild* Complaint"), ECF/*Hibuild* No. 1.)
Hibuild voluntarily dismissed ACIC as a defendant, without
prejudice, by a notice of dismissal filed and so-ordered in
December 2016.  (*See* So-Ordered Notice of Dismissal, ECF/*Hibuild*

---

[13]    The complaint in the *Lighton* Action is dated May 13, 2016, but
indicates that it was filed on May 27, 2016. (*Compare Lighton* Complaint at 1
*with Lighton* Complaint at 6.)

No. 17.)  The *Hibuild* Complaint seeks declaratory judgment that

Mt. Hawley is required to defend and indemnify Hibuild, Lighton,

and DASNY in the Tunkara Action.  (*Hibuild* Complaint at 8.)  The

*Hibuild* Complaint also alleges that Mt. Hawley denied coverage

in bad faith, and on this basis seeks attorneys' fees and

expenses.  (*Id.* ¶¶ 51-58.)

On December 14, 2016, Lighton filed a letter agreeing

to dismiss its "bad faith" claim.  (ECF No. 17.)  As noted

above, on February 2, 2017, Magistrate Judge Gold ordered the

*Lighton* Action and the *Hibuild* Action consolidated (*see* Minute

Entry, ECF No. 20), and the cases were consolidated the

following day.  (*See* February 3, 2017 Docket Notation.)

On May 19, 2017, the court granted the parties leave

to file cross-motions for summary judgment and set a briefing

schedule.  (*See* May 19, 2017 Minute Entry.)  The instant motions

for summary judgment were submitted on September 28, 2017.  (*See*

Allied Motion, ECF No. 23; Mt. Hawley Motion, ECF No. 24;

Lighton Motion, ECF No. 25; Hibuild Motion, ECF NO. 27.)

In connection with its motion for summary judgment,

Lighton served, and eventually filed, a Local Rule 56.1

statement that contains disputed material factual statements,

and contains no citations to any admissible evidence,

respectively in violation of Local Rules 56.1(a) and 56.1(d).

(*See generally* Lighton Initial 56.1 Statement, ECF No. 25-2.)

Both Allied and Mt. Hawley's Local Rule 56.1 counter-statements objected to Lighton's statement on these bases. (*See* Allied Local Rule 56.1 Counter-statement, ECF No. 26-1; Mt. Hawley Local Rule 56.1 Counter-statement to Lighton, ECF No. 28.)

Lighton also served and filed an Amended Local Rule 56.1 statement in connection with its reply brief. (*See* Lighton Amended 56.1 Statement, ECF No. 49-1.) Allied objects to, and Mt. Hawley seeks to strike, Lighton's Amended Local Rule 56.1 statement, (*see* Allied Objection, ECF No. 50; Mt. Hawley Motion to Strike, ECF No. 51), and on October 5, 2017, one week after filing the Amended Local Rule 56.1 statement, Lighton moved to amend its initial statement. (Lighton Motion to Amend, ECF No. 53.)

## Jurisdiction

The only asserted basis for federal jurisdiction in the instant actions is diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*See* Notice of Removal ¶ 14; *Hibuild* Complaint ¶ 8.) Federal district courts have "jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000" and is between "citizens of different States." 28 U.S.C. § 1332(a)(1). The court therefore will only have diversity over each of these consolidated actions if there exists complete diversity in each action, and if each action satisfies the amount-in-controversy requirement.

## I.    Complete Diversity

By statute, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1). Additionally, the citizenship of non-corporation business entities "is derived from the citizenship of all members of the entity.  In particular, limited liability companies . . . obtain citizenship from each of their members."  *ICON MW, LLC v. Hofmeister*, 950 F. Supp. 2d 544, 546 (S.D.N.Y. 2013) (citing, in relevant part, *Carden v. Arkoma Assocs.*, 494 U.S. 185, 189 (1990) and *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012)).

Lighton is a New Jersey corporation with its principal place of business in New Jersey, Allied is a New Hampshire corporation with its principal place of business in New York, and Mt. Hawley is a Delaware corporation with its principal place of business in Illinois.  (Notice of Removal, ECF NO. 1, ¶¶ 6-11.)  There is therefore complete diversity between Lighton and the defendants in the *Lighton* action.  Additionally, Hibuild is a New Jersey LLC with a principal place of business in New York, and all its members are New Jersey residents.  (*Hibuild* Complaint, ECF/*Hibuild* No. 1, ¶ 5.)  As noted above, Mt. Hawley is a Delaware corporation with a principal place of business in

Illinois, and ACIC is incorporated, and has its principal place of business, in North Carolina. (*Id.* ¶¶ 6-7.) There is therefore complete diversity between Hibuild and the defendants in the *Hibuild* action.

## II. Amount in Controversy

Where a party seeks declaratory relief, as plaintiffs do here, "the amount in controversy is measured by the value of the object of the litigation." *Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006) (quoting *Hunt v. Washington State Apple Adver. Com'n*, 432 U.S. 333, 347 (1977)). Here, the value of the object of the litigation depends on defendants' coverage obligations: if plaintiffs prevail, defendants will be required to defend, and possibly indemnify, defendants in the Tunkara Action; if defendants prevail, defendants will owe no defense or indemnification duties. *See Am. Safety Cas. Ins. Co. v. 385 Onderdonk Ave.*, LLC, 124 F. Supp. 3d 237, 238-39, 242-43 (E.D.N.Y. 2015) (applying foregoing analysis in declaratory judgment action brought by insurer seeking declaratory judgment that it had no coverage obligations).

As noted above, Tunkara's Notice of Claim asserts that he seeks damages of $2,000,000 (Notice of Claim at 4), and plaintiffs seek both defense and indemnification in the Tunkara Action. (*Lighton* Complaint at 2; *Hibuild* Complaint ¶ 4.)

Accordingly, in both the *Lighton* Action and the *Hibuild* Action, there is a "reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994)) (internal quotation marks omitted). Thus, the amount in controversy requirement is satisfied in both actions, and the court concludes that it has subject matter jurisdiction over each pursuant to 28 U.S.C. § 1332.

## Applicable Law and Legal Standards

### I. Rule 56

Federal Rule of Civil Procedure ("Rule") 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).

The moving party has "the burden of showing that there is no genuine issue of fact," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986), but "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law,"

and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (citations omitted).

## II.  **Local Rule 56.1**

Local Rule 56.1(a) requires that a party moving for summary judgment "annex[] to [its] notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  It further expressly warns that "[f]ailure to submit such a statement may constitute grounds for denial of the motion."  Local Rule 56.1(a).  Local Rule 56.1(d) requires that "[e]ach statement by the movant . . . be followed by citation to evidence which would be admissible, set forth as required by [Rule] 56(c)."

The Second Circuit has written that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citing *Wight v. Bankamerica Corp.*, 219 F.3d 79, 85 (2d Cir. 2000) and *Somlyo v. J. Lu-Rob Enters.*, 932 F.2d 1043, 1048 (2d Cir. 1991)).

## III. **Declaratory Judgment**

"The Declaratory Judgment Act – not state declaratory judgment law – provides the procedural mechanism for granting declaratory relief in federal diversity cases."  *Am. Standard,*

*Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 715 (S.D.N.Y. 2007)

(citation omitted); *accord Haagen-Dazs Shoppe Co. v. Born*, 897

F. Supp. 122, 126 n.2 (S.D.N.Y. 1995) (collecting cases).

Under the Declaratory Judgment Act, 28 U.S.C. § 2201,

and subject to certain exceptions not applicable here,

> any court of the United States, upon the filing
> of an appropriate pleading, may declare the
> rights and other legal relations of any
> interested party seeking such declaration,
> whether or not further relief is or could be
> sought. Any such declaration shall have the force
> and effect of a final judgment or decree and
> shall be reviewable as such.

28 U.S.C. § 2201(a).

"Declaratory judgment is a form of relief, not a

substantive cause of action." *Rapillo v. CitiMortgage, Inc.*,

No. 15-CV-5976(KAM)(RML), 2018 WL 1175127, at *6 (E.D.N.Y. Mar.

5, 2018) (citation omitted); *see also Nat'l Union Fire Ins. Co.

of Pittsburgh, Pa. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) ("The

DJA is procedural in nature, and merely offers an *additional

remedy* to litigants." (emphasis in original)). Therefore, "a

court may only enter a declaratory judgment in favor of a party

who has a substantive claim of right to . . . relief." *In re

Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir.

1993).

As the text of the Declaratory Judgment Act indicates,

the declaratory judgment remedy is discretionary even where a

party has a substantive claim of right to the relief he or she

seeks. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d

Cir. 1993) ("A district court has broad discretion to decide

whether to render a declaratory judgment." (citations omitted)).

"In the Second Circuit, in deciding whether declaratory judgment

is appropriate, the court must consider '(1) whether the

judgment will serve a useful purpose in clarifying or settling

the legal issues involved; and (2) whether a judgment would

finalize the controversy and offer relief from uncertainty.'"

*Rapillo*, 2018 WL 1175127, at *6 (quoting *Duane Reade, Inc. v.

St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir.

2005)).

## IV.  Choice of Substantive Law

In briefing and arguing the instant motions, the

parties have proceeded under the assumption that New York law

governs the instant disputes, and no party has suggested that

any other source of substantive law applies.  However, no party

has expressly identified a basis for applying New York law, for

instance by citing a choice of law provision in the relevant

insurance contracts.  As set forth below, the court concludes

that New York's substantive law governs the instant disputes.

"A federal court sitting in diversity must apply the

choice of law rules of the forum state." *Lazard Freres & Co. v.

Protective Life Ins. Co.*, 108 F.3d 1531, 1538-39 (2d Cir. 1997)

27

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)).  New York is the forum state, and in contract cases, New York courts apply a "center of gravity" or "grouping of contracts" approach in determining which body of substantive law governs.  *Id.* at 1539 (citation omitted).

"Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties."  *Id.* (quoting *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030–31 (2d Cir. 1996)); *accord In re Allstate Ins. Co. and Stolarz*, 613 N.E.2d 936, 940 (N.Y. 1993).

Additionally, "New York courts may also consider public policy where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests."  *Id.* (quoting *Brink's*, 93 F.3d at 1031) (internal quotation marks omitted); *accord Allstate and Stolarz*, 613 N.E.2d at 939.  Notably, however, "[t]he traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis."  *Id.* (quoting *Brink's*, 93 F.3d at 1031) (internal quotation marks omitted); *accord Allstate and Stolarz*, 613 N.E.2d at 939.

In the insurance law context, the New York Court of Appeals has observed that "the jurisdiction with the most significant relationship to the transaction and the parties will generally be the jurisdiction which the parties understood was to be the principal location of the insured risk unless with respect to the particular issue, some other jurisdiction has a more significant relationship." *In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 1179 (N.Y. 2011) (internal quotation marks and citation omitted).

Here, no party has suggested that any jurisdiction other than New York has a more significant relationship to any issue. Additionally, it is undisputed that the alleged occurrence with respect to which Allied and Hibuild seek defense and indemnification occurred in New York.

Notably, under similar circumstances, the New York Supreme Court, Appellate Division, has affirmed a trial court's determination that New York law applied. Specifically, in *Davis & Partners, LLC v. QBE Insurance Corporation*, 979 N.Y.S.2d 311 (N.Y. App. Div. 2014), the Appellate Division, First Department, concluded that New York law applied to an insurance policy for purposes of determining the insurer's duty to defend and/or indemnify where (i) the contract between the contractor and the construction manager related to a New York project; (ii) that contract was executed in New York, required contractor to carry

insurance, and provided that New York law governed; and (iii) the "occurrence" under relevant policy and underlying action occurred in New York.  979 N.Y.S.2d at 313.  Accordingly, the court will apply New York's substantive law.

## V.    New York Insurance Law

### A.    General Principles of Interpretation

"Under New York law, . . . 'insurance policies are interpreted according to general rules of contract interpretation,'" *Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*, 716 F. App'x 1, 3 (2d Cir. 2017) (quoting *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012)), and "should be read in light of common speech and the reasonable expectations of a businessperson." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 788 N.Y.S.2d 142, 144 (N.Y. App. Div. 2004)).

"The initial interpretation of a contract is a matter of law for the courts to decide," and "[u]nder New York law, an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks and citations omitted).  Further, "'words and phrases should be given their plain meaning,' and the contract 'should be

construed so as to give full meaning and effect to all of its provisions.'" *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)).

"If, however, the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact." *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985) (citation omitted). Further, "if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court," and "the ambiguity must be resolved against the insurer who drafted the contract." *Id.* (citations omitted). The principle that contractual ambiguities must be construed in favor of the insured applies with particular force where the ambiguity occurs "in the language of an exclusion provision." *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995) (citations omitted).

**B.   Duty to Defend and Duty to Indemnify**

**1.   Duty to Defend**

Under New York law, "[a]n insurer has a duty to defend so long as there is any possibility of coverage under the [relevant insurance] policy," *Westpoint Int'l, Inc. v. Am. Int'l S. Ins. Co.*, 899 N.Y.S.2d 8, 9 (N.Y. App. Div. 2010) (citation omitted), and the duty to defend is "exceedingly broad." *Atl. Ave. Sixteen AD, Inc. v. Valley Forge Ins. Co.*, 56 N.Y.S.3d 207, 209 (N.Y. App. Div. 2017) (quoting *Mack–Cali Realty Corp. v. NGM Ins. Co.*, 990 N.Y.S.2d 253, 255 (N.Y. App. Div. 2014)).

Generally, courts determine whether an insurer has a duty to defend claims against its insured "by comparing the allegations of [the] complaint [against the insured] with the wording of the insurance contract." *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004) (citing, in relevant part, *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 521 (N.Y. 1981)). "The duty to defend remains even though facts outside the four corners of the pleadings indicate that the claim *may* be meritless or not covered." *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (emphasis added) (internal quotation marks and citations omitted).

In addition to the four corners of the complaint in an underlying action, however, in determining whether an insurer is obligated to defend its insured, "a court may look to judicial admissions in the insured's responsive pleadings in the underlying tort action or other formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims." *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 679 N.E.2d 1044, 1049 (N.Y. 1997) (citing *Technicon Elecs. Corp. v. American Home Assur. Co.*, 542 N.E.2d 1048, 1051-52 (N.Y. 1989)); *see also Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002) ("New York courts have, in appropriate cases, considered extrinsic evidence where that evidence may conclusively establish that an insurer faces no possible liability." (citation omitted)); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F. Supp. 1416, 1424 (S.D.N.Y. 1991) (noting that courts may, "in exceptional circumstances, look outside the four corners of the complaint to consider whether extrinsic evidence establishes to a certainty that the insurer faces no liability for indemnity" and collecting cases); *Fitzpatrick v. Am. Honda Motor Co.*, 575 N.E.2d 90, 92 (N.Y. 1991) ("[T]o say that the duty to defend is *at least* broad enough to apply to actions in which the complaint alleges a covered occurrence is a far cry from saying that the complaint

allegations are the *sole* criteria for measuring the scope of that duty." (emphasis in original)).

"[A]n insurer can be relieved of its duty to defend if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *E. Ramapo Cent. Sch. Dist. v. New York Sch. Ins. Reciprocal*, 54 N.Y.S.3d 413, 418 (N.Y. App. Div. 2017) (quoting *Allstate Ins. Co. v. Zuk*, 574 N.E.2d 1035, 1037 (N.Y. 1991) and citing *Cumberland Farms, Inc. v. Tower Group, Inc.*, 28 N.Y.S.3d 119, 122 (N.Y. App. Div. 2016)).

Further, where an insurer seeks to be relieved of its duty to defend on the basis of a policy exclusion, it

> bears the heavy burden of demonstrating that the
> allegations of the complaint in the underlying
> action cast the pleadings wholly within that
> exclusion, that the exclusion is subject to no
> other reasonable interpretation, and that there
> is no possible factual or legal basis upon which
> the insurer may eventually be held obligated to
> indemnify the insured under any policy provision.

*E. Ramapo Cent. Sch. Dist.*, 54 N.Y.S.3d at 418 (quoting *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 690 N.E.2d 866, 868-69 (N.Y. 1997)); *see also Yangtze Realty, LLC v. Sirius Am. Ins. Co.*, 934 N.Y.S.2d 480, 480-81 (N.Y. App. Div. 2011) ("The duty to defend is not triggered . . . when the only interpretation of the allegations against the insured is that

the factual predicate for the claim falls wholly within a policy exclusion" (internal quotation marks and citations omitted)).

An insurer seeking to deny coverage based on a classification limitation must similarly demonstrate that the limitation applies and is not susceptible to any interpretation other than the interpretation the insurer offers. *See Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 908 N.E.2d 875, 877 (N.Y. 2009) ("[E]xclusions *or exceptions* from policy coverage must be specific and clear in order to be enforced. . . . [B]efore an insurance company is permitted to avoid policy coverage, it must . . . establish[] that the exclusions *or exemptions* apply in the particular case, and that they are subject to no other reasonable interpretation." (emphasis added) (quoting *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984))); *see also Northfield Ins. Co. v. Cibor Const., Inc.*, No. 13-CV-3131(NGG)(SMG), 2015 WL 5560871, at *5-*8 (E.D.N.Y. July 23, 2015) (analyzing classification limitation under same standards as exclusions from coverage)*, report and recommendation adopted*, 2015 WL 5567067 (E.D.N.Y. Sept. 21, 2015)*.

### 2. Duty to Indemnify

An insurer's duty to indemnify (*i.e.*, to pay out on its policy) is narrower than its duty to defend. *See Frontier Insulation*, 690 N.E.2d at 870 ("[A]n unbroken line of cases

establishes that an insurer's duty to defend is broader than its duty to indemnify." (citations omitted)). "While the duty to defend is measured against the possibility of a recovery, the duty to pay is determined by the actual basis for the insured's liability to a third person." *Id.* (internal quotation marks and citations omitted). Thus, "an insurer may be contractually bound to defend even though it may not ultimately be bound to pay, either because its insured is not factually or legally liable or because the occurrence is later proven to be outside the policy's coverage." *Id.* (quoting *Fitzpatrick*, 575 N.E.2d at 92 (N.Y. 1991)).

## Discussion

### I. Lighton's Local Rule 56.1 Statement

Lighton had ample notice of the requirements of Local Rule 56.1, yet failed to submit a compliant Local Rule 56.1 statement. The plaintiff and defendants, however, do not dispute the existence and language of the DASNY-Lighton agreements, the Lighton-Hibuild subcontract, and the insurance policies, although the dispute their meaning. Additionally, because defendants have filed their own Local Rule 56.1 statements in support of their motions for summary judgment, which address identical factual issues, defendants will not be prejudiced by the court's consideration of Lighton's Amended Local Rule 56.1 statement.

For these reasons, and in an exercise of its "broad discretion to determine whether to overlook a party's failure to comply with local court rules," *Holtz*, 258 F.3d at 73 (citations omitted), the court will consider Lighton's amended Local Rule 56.1 statement. For the avoidance of doubt, although the court considers Lighton's Amended Local Rule 56.1 statement, the court will not deem any facts asserted therein admitted by virtue of defendants' failure to file a response to Lighton's late-filed statement.

## II.  Mt. Hawley's Duty to Defend

Hibuild seeks summary judgment in its favor solely "on the issue of Mt. Hawley's duty to defend Hibuild in the Tunkara Action" (Hibuild Mem. at 10), and expressly concedes that "the issue of Mt. Hawley's duty to indemnify Hibuild . . . is not yet ripe." (*Id.* at 1 n.1.)[14]  Hibuild asserts that it is entitled to defense in the Tunkara Action because the action is covered by the Mt. Hawley CGL Policy, (*id.* at 5-7), and because Mt. Hawley cannot establish that any exclusion applies.  (*Id.* at 7-10.) Lighton, for its part, seeks summary judgment that Mt. Hawley is

---

[14]    The *Hibuild* Complaint seeks declaratory judgment that Mt. Hawley is required to defend and indemnify Hibuild, Lighton, and DASNY in the Tunkara Action.  (Hibuild Complaint at 8.)  Hibuild's instant motion for summary judgment, however, does not seek summary judgment as to Mt. Hawley's duty to defend or indemnify Lighton or DASNY, although Lighton's instant motion seeks summary judgment that Mt. Hawley must defend and indemnify it.  Thus, this Memorandum and Order addresses whether Mt. Hawley owes Hibuild a duty to defend and owes Lighton duties of defense and/or indemnification, but does not address whether Mt. Hawley owes a similar duty or duties to DASNY.

obligated both to defend and indemnify it as an "additional insured" under the Mt. Hawley CGL Policy and the Mt. Hawley Excess Policy. (Lighton Mem. at 25.)

Conversely, Mt. Hawley seeks summary judgment in its favor on the grounds that (i) the Tunkara Action is outside the scope of the Mt. Hawley CGL Policy and the Mt. Hawley Excess Policy by operation of the Classification Limitation, and, in the alternative, (ii) the Designated Ongoing Operations Exclusion excludes the Tunkara Action from Mt. Hawley policies' scope of coverage. (Mt. Hawley Mem. at 9-15.) Additionally, Mt. Hawley asserts that Lighton cannot qualify as an additional insured under the policies at issue. (*Id.* at 7 n.2, 15-16.)

### A.    Policy Language

Upon a review of the relevant Mt. Hawley-Hibuild policy provisions, specifically the Classification Limitation and the Designated Ongoing Operations Exclusion, in light of the New York law that governs them and the record before the court, the court concludes that both provisions are ambiguous as applied here and are therefore construed against Mt. Hawley.

### 1.    The Classification Limitation

To reiterate the operative language, the Mt. Hawley CGL Policy's Classification Limitation, which the Mt. Hawley Excess Policy incorporates by reference (Mt. Hawley Excess Policy at MH000300), provides that

> [t]his insurance applies only to "bodily injury,"
> "property damage" and/or "personal and
> advertising injury" resulting from the
> Classification or Operations as per application:
> [Hibuild's] operations as a General Contractor
> with incidental exterior work not to exceed 2
> stories.

(Mt. Hawley CGL Policy at MH002299.)

Based on the Classification Limitation and Hibuild's representations to Mt. Hawley in its application paperwork, Mt. Hawley contends that the Mt. Hawley CGL Policy "clearly provides that any 'exterior work' must be incidental to Hibuild's interior work." (Mt. Hawley Opposition to Plaintiffs' Motions ("Mt. Hawley Opp."), ECF No. 30, at 17.) Mt. Hawley further contends that because the James Hall renovation involved no interior work, "none of the exterior work could have been incidental." (*Id.*; *see also* Mt. Hawley Mem. at 11 ("Hibuild's exterior work was not incidental, as the entirety of the [James Hall] project consisted of interior work.")

Mt. Hawley's argument rests on the proposition that in evaluating whether any given "exterior work above two stories" is "incidental," the court should look to the specific project for which the relevant work was performed, and not, as Hibuild contends, to Hibuild's overall operations. (*See* Hibuild Opposition to Mt. Hawley Motion, ECF No. 35, at 10-11 ("[T]he Mt. Hawley Policy expressly covers . . . exterior work up to two stories in height that is 'incidental' to Hibuild's 'operations

as a General Contractor.'" (emphasis and citations omitted).)
As the insurer seeking to deny coverage, Mt. Hawley must
demonstrate that its interpretation is correct, the
Classification Limitation is "subject to no other reasonable
interpretation," *Pioneer Tower*, 908 N.E.2d at 877 (citation
omitted), and that Hibuild's contention that the court should
look to Hibuild's overall operations is not consistent with the
"reasonable expectations of a businessperson." *See Parks Real
Estate*, 472 F.3d at 42 (noting that insurance policies are "read
in light of . . . the reasonable expectations of a
businessperson.")

Mt. Hawley, however, cites to no contractual
provision, evidence in the record, or applicable law
establishing that, in determining whether work is "incidental"
within the meaning of the Classification Limitation, the court
must look to the specific project in which that work arises,
instead of the insured's overall operations. Looking first to
the relevant contractual language, Mt. Hawley contends that
"incidental" should be accorded its plain and ordinary meaning,
which is "subordinate to something of greater importance." (Mt.
Hawley Mem. at 11 (citation omitted); Mt. Hawley Opp. at 18
(citation omitted).) The court agrees with Mt. Hawley's
interpretation of the word "incidental," but this interpretation
sheds no light on whether Hibuild's operations, or only its

specific projects are the "[]thing[s] of greater importance" to which exterior work may be "subordinate" within the meaning of the Classification Limitation.

Comparing the Classification Limitation with the policy language from which Mt. Hawley draws its interpretation of the term "incidental" puts into stark relief the lack of clear direction in the Mt. Hawley CGL Policy's Classification Limitation. In Mt. Hawley's cited case, *Lend Lease (US) Construction LMB Inc. v. Zurich American Insurance Company*, the policy at issue was for a specific project and "insure[d] against all risks of direct physical loss of or damage to," in relevant part, "temporary buildings or structures . . . all incidental *to the project*." 22 N.Y.S.3d 24, 27 (N.Y. App. Div. 2015) (emphasis added), *aff'd*, 71 N.E.3d 556 (N.Y. 2017). Thus, the *Lend Lease* policy unambiguously set forth a reference point against which the "incidental" character of "temporary buildings or structures" must be determined. Here, however, the Classification Limitation sets forth no analogous reference point for "exterior work not to exceed two stories."

Further, Hibuild's proposed reading of the Classification Limitation is consistent with principles of contract interpretation. The Second Circuit has noted that, in interpreting written instruments, courts "often interpret a word by the 'company it keeps (the doctrine of *noscitur a sociis*).'"

*Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210–11 (2d Cir.
2016) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)
and citing *WPP Luxembourg Gamma Three Sarl v. Spot Runner Inc.*,
655 F.3d 1039, 1051, 1051 n.3 (9th Cir. 2011)); *see also WPP
Luxembourg*, 655 F.3d at 1051 n.3 (applying *noscitur a sociis* to
a contract).  Here, the word "incidental" keeps company with
Hibuild's "operations," but not "projects."  Thus, Hibuild's
proposed reading, unlike Mt. Hawley's, relies on the words
actually used in the Classification Limitation and does not
require that the court look to concepts and terms that are
wholly absent from the Classification Limitation.

        Moreover, Mt. Hawley's extrinsic evidence and
remaining arguments do not provide a sufficient basis to
conclude that Hibuild's reading of the Classification Limitation
is not reasonable.  In support of its own reading of the
Classification Limitation, Mt. Hawley relies on representations
by Hibuild in its insurance application materials.  (*See* Mt.
Hawley Reply, ECF No. 34, at 2 ("Mt. Hawley's references to
Hibuild's own prior representations [are] offered only to rebut
Lighton's and Hibuild's incorrect arguments that the language at
issue should be interpreted otherwise.").  For instance, Mt.
Hawley asserts that Hibuild represented that it "is an interior
contractor that performed no exterior renovation, façade work,
or masonry," and suggests that that Hibuild therefore "could not

have reasonably had any expectation of coverage" for the James Hall Repairs.  (Mt. Hawley Mem. at 11.)

Even under Mt. Hawley's reading of the Classification Limitation, however, so long as a given instance of exterior renovation, façade work, and/or masonry were to remain incidental to an interior project, Hibuild would be covered. Thus, Mt. Hawley's own interpretation of the Classification Limitation establishes that Hibuild could reasonably expect coverage for at least certain exterior renovation, façade work, and/or masonry.  Moreover, Hibuild's representations regarding the types of exterior work it performed in its overall operations shed no light on whether the "incidental" nature of a particular instance of exterior work should be determined with reference to Hibuild's overall operations, or the project on which Hibuild performed the relevant work.

Mt. Hawley also asserts, albeit in discussing the Designated Ongoing Operations Exclusion, that exterior work is riskier and therefore commands higher premiums.  (Mt. Hawley Mem. at 13-14.)  Once again, however, Mt. Hawley concedes that certain "incidental" exterior work is covered.  (*See* Mt. Hawley Opp. at 17 (asserting that, to be covered, "any 'exterior work' must be incidental to Hibuild's interior work").)  Therefore, Mt. Hawley necessarily concedes that the premiums Mt. Hawley accepted from Hibuild took into account the added risk from

incidental exterior work.  Additionally, both Mt. Hawley and

Hibuild's proposed readings limit Mt. Hawley's exposure to risk

and potential liability arising from purportedly higher-risk

exterior work, which Mt. Hawley suggests is the purpose of the

Classification Limitation.  (*See* Mt. Hawley Opp. at 17 n.5

("[T]he [C]lassification [L]imitation was placed on the Mt.

Hawley policy in direct response to Hibuild's representations in

its application.").)

      As the instant action demonstrates, Hibuild's proposed

interpretation of the Classification Limitation may not limit

Mt. Hawley's exposure as much as Mt. Hawley would prefer.

Hibuild's proposed interpretation nevertheless unquestionably

accomplishes the overall purpose of the Classification

Limitation, and consequently, Mt. Hawley's suggestions regarding

the purpose of the Classification Limitation do not suffice to

establish that Hibuild's reading of the Classification

Limitation is not a "reasonable interpretation" of the relevant

contractual language, which is the standard Mt. Hawley must

meet.  *Pioneer Tower*, 908 N.E.2d at 877 (citation omitted).

Consequently, Mt. Hawley's arguments regarding risks, premiums

and the purpose of the Classification Limitation do not

establish the unreasonableness of Hibuild's position regarding

the reference point that the court should use to determine

whether particular exterior work is "incidental."

Hibuild's application materials, which the Classification Limitation expressly references, do not clarify whether the court should look to the particular project on which Hibuild performed work or to Hibuild's operations as a whole in determining whether the particular "exterior work" in this case was "incidental." Nor do Mt. Hawley's arguments regarding the purpose of the Classification Limitation or the relative risks of interior and exterior work establish that Hibuild's interpretation of the Classification Limitation is incorrect.

Accordingly, the court concludes that the Classification Limitation is ambiguous insofar as it does not clearly establish what the court should reference in determining whether a particular instance of exterior work is "incidental." As New York law requires, the court will resolve this ambiguity against Mt. Hawley, "the insurer which drafted the contract." *Home Indemnity*, 486 N.E.2d at 829. Thus, the court concludes that the "incidental" nature of exterior work must be determined with reference to Hibuild's operations as a whole. Under that interpretation, Mt. Hawley has not established that the Mt. Hawley CGL Policy and the Mt. Hawley Excess Policy do not cover the Tunkara Action based on the Classification Limitation, as the only evidence in the record regarding Hibuild's overall operations indicates that the overwhelming majority of Hibuild's operations are interior. (*See*, *e.g.*, Contractors Supplemental

Application, Joint Stip. Ex. P(1), ECF No. 22-16, at RSG-000017
(describing Hibuild's operations as "[i]nterior retrofitting at
federal installations & commercial buildings"), RSG-000018
(representing that Hibuild does no work over two stories in
height from grade other than interior work), and RSG-000019
(indicating Hibuild expected no payroll or subcontracting costs
for any work involving "Exterior Restoration," "Façade Work," or
"Masonry" during the policy term).)

### 2. The Designated Ongoing Operations Exclusion

The Designated Ongoing Operations Exclusion is set
forth in an endorsement, which provides that the Mt. Hawley CGL
Policy "does not apply to 'bodily injury' . . . arising out of
the ongoing operations described in the Schedule of th[e]
endorsement." (Mt. Hawley CGL Policy at MH002305.) Ongoing
operations within the Designated Ongoing Operations Exclusion
are identified, in relevant part, in the schedule as "[e]xterior
work/projects above 2 stories." (*Id.*)

### a. "[A]rising out of"

"In the context of a policy exclusion, the phrase
arising out of is unambiguous, and is interpreted broadly to
mean 'originating from, incident to, or having connection
with.'" *Country-Wide Ins. Co. v. Excelsior Ins. Co.*, 46
N.Y.S.3d 96, 98 (N.Y. App. Div. 2017) (quoting *Scottsdale*

*Indemn. Co. v. Beckerman*, 992 N.Y.S.2d 117, 121 (N.Y. App. Div. 2014)), *leave to appeal denied*, 89 N.E.3d 1258 (N.Y. 2017).

To determine whether an "arising out of" exclusion applies, New York courts apply a "but for" test. *Id.* (citing *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E.2d 404, 405 (N.Y. 1996)). Thus,

> if the plaintiff in an underlying action or proceeding alleges the existence of facts clearly falling within such an exclusion, and none of the causes of action that he or she asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to defend the action.

*Scottsdale Indemnity*, 992 N.Y.S.2d 117, 121 (N.Y. App. Div. 2014) (citing, *inter alia*, *Mount Vernon Fire Insurance*, 668 N.E.2d at 405-06).

To determine whether the Tunkara Action is excluded from coverage under the the Designated Ongoing Operations Exclusion, the court must determine whether the Tunkara Action "could exist but for the existence of the excluded activity or state of affairs," *id.*, namely, "[e]xterior work/projects above 2 stories."

### b. "Exterior work/projects above 2 stories"

As an initial matter, the parties do not dispute that the activity giving rise to the Tunkara Action was "exterior" within the meaning of the Designated Ongoing Operations Exclusion, as all work on James Hall was exterior.

47

Additionally, the court ascribes plain and ordinary meaning to the terms "work" and "projects."  *See LaSalle Bank Nat. Ass'n*, 424 F.3d at 206 (noting that, in interpreting insurance contracts, "words and phrases should be given their plain meaning" (citation omitted)).

Black's Law Dictionary defines "work" as "[p]hysical and mental exertion to attain an end, esp[ecially] as controlled by and for the benefit of an employer; labor."  Black's Law Dictionary (10th Ed. 2014) at 1840.  Webster's Dictionary defines "work" similarly: it is "activity in which one exerts strength or faculties to do or perform . . . sustained physical or mental effort valued as it overcomes obstacles and achieves an objective or result," and/or "the labor, task, or duty that affords one his accustomed means of livelihood."  Webster's Third New International Dictionary of the English Language, Unabridged (2002) ("Webster's Unabridged") at 2634.  In contrast, Webster's defines a "project," as relevant here, as "a planned undertaking," particularly one "devised to effect the . . . improvement of a particular area of land."  Webster's Unabridged 1813.

Based on these definitions, the court concludes that "work" refers to specific action(s) by individual persons aimed at completing a task or tasks.  "Project" has a broader meaning, as it refers to a larger planned undertaking that is, as

48

applicable here, comprised of various coordinated instances of work with a common, overarching objective.

Applying these plain meanings, the court concludes that the Tunkara Action arises out of an exterior "project" involving a structure above two stories, because the Tunkara Action "originat[es] from, [is] incident to, or ha[s] connection with" the five-story James Hall Renovation. *Country-Wide Ins. Co.*, 46 N.Y.S.3d at 98 (citation omitted); *see also Scottsdale Indemnity*, 992 N.Y.S.2d at 121 (noting that courts look to whether the causes of action in underlying litigation "could exist but for the existence of the excluded activity or state of affairs" in determining whether an action "arises from" an exclusion).

The court cannot conclude, however, that the Tunkara Action arises out of exterior "work" above two stories. As discussed above, the Tunkara Action complaint and the Bill of Particulars are wholly silent as to the story or stories of James Hall on which Tunkara was performing work at any time relevant to his alleged fall that gave rise to his action, and no other information before the court sheds light on the matter. The Tunkara Complaint and Bill of Particulars are also wholly silent as to what work, if any, by Tunkara could be relevant to Tunkara's alleged fall. Therefore, there is no basis in the

record to conclude that any "work" above two stories was a "but for" cause of Tunkara's alleged fall.

As an illustrative example, the record before the court leaves open the possibility that Tunkara's alleged accident could have arisen from Tunkara climbing a ladder to hang a sign on the higher portions of ground-level scaffolding. Under this set of circumstances, Tunkara's alleged accident would be wholly disconnected from any work above two stories by Tunkara or any other person, and would therefore not "arise out of" exterior work above two stories. The court concludes that Mt. Hawley, which has the burden of establishing that the Tunkara Action falls within the Designated Ongoing Operations Exclusion, has not established that the Tunkara Action arises out of "work" above two stories.

Critically, the terms "work" and "projects" as they appear in the Designated Ongoing Operations Exclusion are separated by a virgule, also referred to as a forward slash, and the virgule's meaning is dispositive of whether Tunkara's alleged injury falls within the Designated Ongoing Operations Exclusion. If the virgule means "or," or "and/or," then the Designated Ongoing Operations Exclusion applies where bodily injury arises out of an exterior "project" above two stories regardless of whether the bodily arises from exterior "work." If, however, the virgule means "and," then bodily injury must

arise from *both* an exterior "project" and exterior "work," in
each case above two stories.

Here, no party has expressly stated how it believes
the virgule should be interpreted.  The court notes that Mt.
Hawley argues that the precise floor on which Tunkara was
located at the time of his accident is "immaterial because the
project was a five-story exterior restoration" (Mt. Hawley Opp.
at 8), thus reading the virgule as "or" or "and/or."

Nothing in the Mt. Hawley CGL Policy clearly supports,
much less compels, Mt. Hawley's interpretation, or any other
reading of the virgule.  Further, the limited authority that
exists regarding the meaning of a virgule does not establish a
clear meaning.  For instance, in *Elcor Health Services, Inc. v.
Novello*, the New York Court of Appeals considered a challenge to
the Department of Health's interpretation of the phrase "has
this potential/is improving," as it appeared in a New York
regulation.  *See* 794 N.E.2d 14, 15-16 (N.Y. 2003).  The
Department of Health asserted that "'actual improvement' by a
patient" was a prerequisite for certain reimbursements.  *Id.* at
15.  The Department of Health thus interpreted the virgule to
mean "and."

The appellant, a health care provider seeking
reimbursement, *see id.* at 16, asserted that "the Department's
use of the virgule . . . in the regulation – 'has this

51

potential/is improving' – means 'or.'" *Id.* at 18.  The Court of

Appeals disagreed, and noted that a virgule is susceptible to

multiple interpretations: "[t]hat the Department's

interpretation might not be the most natural reading of the

regulation, or that the regulation could be interpreted in

another way, does not make the interpretation irrational." *Id.*

Additionally, the opinion of the New York Supreme

Court, Appellate Division in *Elcor* contains a thorough

discussion of the "role played by the forward slash or virgule

in the phrase 'patient has this potential/is improving.'" *Elcor*

*Health Servs. Inc. v. Novello*, 744 N.Y.S.2d 71, 73-74 (N.Y. App.

2002), *aff'd*, 794 N.E.2d 14 (N.Y. 2003).  Notably, the Appellate

Division observed that the 1986 edition of Webster's Third New

International Dictionary (Unabridged) defines "virgule" as "a

symbol used to denote, *inter alia*, "or" or "and or."  *Id.* at 73

(citation omitted).[15]  The Appellate Division concluded that

"[e]ven defined in this way, the virgule allows for usage as

'and', resulting in no contradiction when both alternatives

apply."  *Id.*

---

[15]    A more recent publication of Webster's Unabridged Third New
International Dictionary of the English Language, Unabridged, cited above in
the court's discussion of the interpretation of "work" and "project,"
contains a substantially identical definition.  *See* Webster's Unabridged
2138, 622.

The Appellate Division noted that still another dictionary provides a "more comprehensive[]" definition of "virgule," specifically "a short oblique stroke (/) between two words indicating that whichever is appropriate may be chosen to complete the sense of the text in which they occur." *Id.* (citing Random House Dictionary of the English Language (Unabridged) (2d ed. 1993) at 2125). In light of this definition, the Appellate Division considered the relevant regulation as a whole (as opposed to only the phrase at issue), as well as the overall regulatory scheme, and concluded that the Department's interpretation of the regulation, *i.e.*, as an "and," "ha[d] a rational basis." *Id.* at 73-74.

Further, a Second Circuit partial concurrence notes that, according to a different version of Webster's from that cited in *Elcor* (specifically, the Third Edition of Webster's New World Dictionary, published in 1986), a virgule is used between two words to show that either meaning is applicable. *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 72 n.5 (2d Cir. 2014) (Raggi, J. concurring in part and dissenting in part). *Matusick*, however, did not involve a contract, and the reference to a virgule arose in discussion of the phrasing of certain arguments in the litigation. Specifically, the concurring opinion observed that in argument to the jury before the district court, and in briefing to the Second Circuit,

plaintiff-appellee's counsel had conflated the status of the plaintiff-appellee's relationship with his significant other, which was a "critical fact supporting [his] constitutional claim of intimate association."  *Id.* at 72 and 72 n.5.  The definition of "virgule" set forth in the *Matusick* concurrence is thus of limited usefulness here.

In addition, the New York Supreme Court, Appellate Division, Fourth Department, relying in part on various lower court decisions, has concluded that checks drawn to two payees with their names separated by a virgule are payable in the alternative, thereby construing a virgule as an "or."  *See L.B. Smith, Inc. v. Bankers Tr. Co. of W. N. Y.*, 439 N.Y.S.2d 543, 544–45 (N.Y. App. Div. 1981) (collecting cases), *aff'd* 434 N.E.2d 261 (N.Y. 1982).  The Appellate Division, First Department, however, has concluded that where a plaintiff drafted a check and used "what might be interpreted as a virgule in addition to the word 'and' between payees," the check was ambiguous on its face, payable jointly, and required both payees' endorsements. *C.H. Sanders Const. Co. v. Bankers Tr. Co.*, 506 N.Y.S.2d 58, 59 (N.Y. App. Div. 1986).

In sum, all authority on point suggests that the virgule, as it appears in the Designated Ongoing Operations Exclusion, is ambiguous and susceptible to interpretation as meaning "or," "and," or "and/or."  Further, nothing in the

record suggests that interpreting the virgule to mean "and" would not conform to the "reasonable expectations of a businessperson." *Parks Real Estate*, 472 F.3d at 42 (citation omitted). Mt. Hawley notes that the Designated Ongoing Operations Exclusion reflects "the balance of risks and benefits the parties achieved" in negotiating coverage (Mt. Hawley Mem. at 14), and that Mt. Hawley sought to limit its exposure to risks associated with certain exterior work (*see id.* at 14-15), but construing the virgule as an "and" would still effect a reduction in exposure.

As previously noted, longstanding case law holds that ambiguities must be construed against the insurer. Certainly Mt. Hawley, as an insurer, would now *prefer* that the policy be read more narrowly, specifically by reading the virgule to mean "or," and may have intended the virgule to mean "or." Based on the record before the court, however, the court concludes that the virgule is ambiguous, and particularly because the virgule arises in an exclusion, New York law requires that it be construed against Mt. Hawley. *See Home Indemnity*, 486 N.E.2d at 829 ("[T]he ambiguity must be resolved against the insurer which drafted the contract." (citation omitted)); *Sylvan Beach*, 55 F.3d at 115 ("[I]f the policy language is ambiguous, particularly the language of an exclusion provision, the ambiguity must be interpreted in favor of the insured."

(citation omitted)). Based on the foregoing, the court construes the virgule to mean "and." Thus, to fall within the Designated Ongoing Operations Exclusion, bodily injury must arise out of both exterior work and an exterior project, in each case above two stories.

Accordingly, the court concludes that Mt. Hawley has not established that the claims asserted in the Tunkara Action fall within the Designated Ongoing Operations Exclusion. As set forth above, the claims asserted in the Tunkara Action certainly arise out of an exterior project above two stories, but the court cannot conclude that it arises from exterior work above two stories.

B.    **Application to Hibuild's Motion**

Because the court must construe the ambiguities in the Classification Limitation and the Designated Ongoing Operations Exclusion against Mt. Hawley, the court concludes that a "possibility of coverage" exists under the Mt. Hawley CGL and Mt. Hawley Excess Policies, *Westpoint International*, 899 N.Y.S.2d at 9, as Mt. Hawley has not established that the claims in the Tunkara Action fall outside the policies' coverage, or are excluded from coverage, based on the Classification Limitation or the Designated Ongoing Operation Exclusion, respectively. "An insurer has a duty to defend so long as there is any possibility of coverage under the [relevant insurance]

policy," *id.* (citation omitted), and Mt. Hawley therefore owes Hibuild a duty to defend the Tunkara Action.  Consequently, as to Hibuild's claim for a declaration that Mt. Hawley owes it a duty of defense in the Tunkara Action, Hibuild's motion for summary judgment is granted, and Mt. Hawley's motion for summary judgment is denied.

### C.    Application to Lighton's Motion

As noted above, Lighton has also moved for summary judgment that Mt. Hawley must defend and indemnify it based on Lighton's contention that it is an "additional insured" under the Mt. Hawley Policy.  (Lighton Mem. at 25.)  Mt. Hawley asserts that Lighton is not an additional insured, but does not explain the basis for this contention. (*See* Mt. Hawley Mem. at 7 n.2, 15-16.)

The Mt. Hawley CGL Policy includes an additional insured endorsement (the "Additional Insured Endorsement"), which, subject to certain exclusions not applicable here, includes

> any person or organization for whom [Hibuild]
> [is] performing operations when [Hibuild] and
> such person or organization have agreed in
> writing in a contract or agreement that such
> person or organization be added as an additional
> insured on your policy.

(Mt. Hawley CGL Policy, Joint Stip. Ex. O, ECF No. 22-15, at MH002311.)[16]

New York courts have interpreted substantially similar provisions as requiring "contractual privity between the insured and each organization seeking coverage as an additional insured under the relevant policy." *Muss Dev., LLC v. Nationwide Ins. Co.*, No. 13-CV-4848(RJD)(MDG), 2015 WL 6160240, at *6 (E.D.N.Y. Oct. 20, 2015) (emphasis omitted) (citing *AB Green Gansevoort, LLC v. Peter Scalamandre & Sons, Inc.*, N.Y.S.2d 3, 4-5 (N.Y. App. Div. 2013) and *Zoological Soc. of Buffalo, Inc. v. Carvedrock, LLC*, No. 10–CV-35(RJA), 2014 WL 3748545, at *7 (W.D.N.Y. July 29, 2014)).  There is no freestanding requirement, however, that an insurer expressly agree to add, or be given notice of the addition of, a specific entity as an additional insured absent contractual language imposing such a requirement or requirements.  *Cf. AB Green Gansevoort*, 961 N.Y.S.2d at 4-5 (noting that plain language of additional insured endorsement determines its scope).

---

[16]    Allied's memorandum of law points out that Mt. Hawley at one point asserted that Lighton was not an additional insured "on the basis that it did not provide a copy of a contract or agreement requiring to name Lighton as an additional insured."  (Allied Mem. at 9 n.2 (citing Joint Stip Ex. V, ECF No. 22-30, at MH000065 and Joint Stip. Ex. W, ECF No. 22-31, at MH000093.)  However, nothing in the Additional Insured Endorsement requires that a copy of an agreement to add a party as an additional insured be provided to Mt. Hawley as a prerequisite for additional insured status.  Instead, the Additional Insured Endorsement requires only that the agreement exist and be in force.

The Mt. Hawley CGL Policy further clarifies the extent of coverage for an additional insured as follows:

> Such person or organization is an additional insured only with respect to "bodily injury," "property damage" or "personal and advertising injury caused, in whole or in part, by:
>
> 1. [Hibuild's] acts or omissions; or
> 2. The acts or omissions of those acting on [Hibuild's] behalf;
>
> in the performance of [Hibuild's] ongoing operations for the additional insured.

(Mt. Hawley CGL Policy at MH002311.)

The Mt. Hawley Excess Policy provides that "[t]he word 'insured' means any person or organization qualifying as an insured person under the terms of the underlying insurance," *i.e.* the Mt. Hawley CGL Policy. (Mt. Hawley Excess Policy, Joint Stip. Ex. Q, ECF No. 22-25, at MH000300; *see also* Mt. Hawley Excess Policy at MH000299 (identifying underlying insurance).) It further provides that, in relevant part, "[s]ubject to the other provisions of this policy, [Mt. Hawley] will pay on behalf of the insured the insured's ultimate net loss if such loss results from an occurrence insured by the underlying insurance." (Mt. Hawley Excess Policy at MH 000300.) Thus, if a party is an additional insured under the Mt. Hawley CGL Policy, it will also have insurance under the Mt. Hawley Excess Policy.

Here, Mt. Hawley concedes that "[i]t is undisputed that the December 21, 2012 Lighton-Hibuild 'Standard Form of Agreement Between Contractor and Subcontractor' requires Hibuild to procure, *inter alia*, liability coverage with limits of at least $2 million and to make Lighton an additional insured on Hibuild's commercial liability insurance policy." (Mt. Hawley Local Rule 56.1 Counter Statement to Lighton, ECF No. 28, ¶ 5(a) (citation omitted); *see also* Subcontracting Agreement, Joint Stip. Ex. H, ECF No. 22-8 § 13.1 (requiring, in relevant part, that Hibuild obtain insurance that names Lighton as an additional insured).)

Accordingly, Lighton is an additional insured under the Mt. Hawley CGL Policy and the Mt. Hawley Excess Policy by operation of the Additional Insured Endorsement, and Mt. Hawley owes Lighton a duty to defend the Tunkara Action. *See Muss Development*, 2015 WL 6160240, at *5-7 (finding in favor of party claiming additional insured status under substantially similar contractual provision where contractual requirements for additional insured status were satisfied). Consequently, as to Lighton's claim for a declaration that Mt. Hawley owes it a duty of defense in the Tunkara Action, Lighton's motion for summary judgment is granted, and Mt. Hawley's motion for summary judgment is denied.

## III. Allied's Duty to Defend

Allied's argument that it has no duty to defend or
indemnify any party rests entirely on its contention that
coverage under the Mt. Hawley policies is lacking, and therefore
the Subcontractor Exclusion of the Allied-Lighton policy is
triggered.[17]  (Allied Mem. at 7-11; Allied Reply, ECF No. 36, at
4-6.)  Notably, Allied concedes that the Mt. Hawley policies, if
applicable, satisfy the coverage limitations requirements set
forth in the Subcontractor Exclusion.  (Allied Mem. at 9 ("[T]he
[Mt. Hawley] policies had the required limits." (citing Allied
Rule 56.1 Statement, ECF No. 23-2, ¶¶ 16, 18)).)

Further, Lighton's assertion that Allied is obligated
to defend it is based on Lighton's contention that Mt. Hawley is
obligated to defend the Tunkara Action.  (*See* Lighton Mem. at
23-25; Lighton Reply, ECF No. 49, at 12-13 (asserting that Mt.
Hawley's denial was wrongful, and Allied is therefore obligated
to defend)).  Thus, summary judgment as to Allied turns on
whether Mt. Hawley has a duty to defend Hibuild.

As set forth above, the court has concluded that Mt.
Hawley owes Hibuild a duty to defend because Mt. Hawley has not
established that the claims asserted in the Tunkara Action fall

---

[17]     Allied has reserved its right to deny coverage should the court
determine that Lighton is not additional insured under the Mt. Hawley CGL and
Excess Policies, (Allied Mem. at 9 n.2), but the court has concluded that
Lighton is an additional insured.

outside the scope of coverage.  Accordingly, Allied cannot

establish that the claims asserted in the Tunkara Action fall

outside the scope of the Allied Policy, and Allied owes Lighton

a duty to defend the Tunkara Action.  Therefore, as to Lighton's

claim for a declaration that Allied owes it a duty of defense in

the Tunkara Action, Lighton's motion for summary judgment is

granted, and Allied's motion for summary judgment is denied.

## V.  Indemnification

As noted above, Hibuild does not seek summary judgment

regarding Mt. Hawley's duty to indemnify, and concedes that the

issue is not ripe for adjudication.  (Hibuild Mem. at 1 n.1.)

All other parties in these consolidated actions (*i.e.*, Lighton,

Allied, and Mt. Hawley), however, have moved for summary

judgment as to indemnification.  No party, however, has

established that it is entitled to summary judgment on the issue

of indemnification.

As the parties made clear on the record when the court

held oral argument on the instant motions, the Tunkara Action

has not yet resulted in a determination that either plaintiff

here is liable to Tunkara.  At this time, there is no liability

for which defendants could indemnify plaintiffs Lighton or

Hibuild.  Additionally, the record is unclear as to the story of

James Hall on which Tunkara was working at the time of his

alleged injuries, and as to the existence and nature of any

other exterior work that may be connected to Tunkara's alleged accident. This lack of clarity resulted, in part, in the court's finding that defendants must defend plaintiffs as set forth herein. This lack of clarity also prevents any party from establishing that a duty to indemnify does or does not exist. Accordingly, no party has established that undisputed material facts entitle it to judgment as a matter of law on the issue of indemnification, and the motions for summary judgment by Lighton, Allied, and Mt. Hawley as to indemnification must be denied.

Further, the Second Circuit has concluded that "[w]here . . . 'another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties,' it is entirely appropriate for a district court to dismiss a declaratory judgment action." *Westport Ins. Corp. v. Hamilton Wharton Grp. Inc.*, 483 F. App'x 599, 604 (2d Cir. 2012) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)). For dismissal of the federal declaratory judgment action to be appropriate in the foregoing circumstances, there need not be a complete identity of issues between the federal action and the underlying state action, and it is enough that there be "numerous unresolved issues in common." *See id.* ("[T]he declaratory judgment action and the State Actions have numerous unresolved issues in common. . . . As a result, the

district court did not abuse its discretion in dismissing as premature the indemnification portion of [the federal] declaratory judgment action.")

Here, the issues presented by Lighton and Hibuild's indemnification claims largely overlap with the issues presented in the Tunkara Action. At a minimum, the Tunkara Action will resolve the issue of plaintiffs' liability to Tunkara. It may also resolve the issue of the precise story of James Hall on which Tunkara was located all times relevant to his alleged accident, and whether any other "work" was a "but for" cause of Tunkara's alleged accident, or whether that work took place "above two stories."

Because the pending Tunkara Action may resolve the foregoing issues, and in resolving the issues may find that neither Lighton nor Hibuild is liable to Tunkara, the court dismisses without prejudice and as premature the indemnification portions of these consolidated declaratory judgment actions. *See Westport Insurance*, 483 F. App'x at 604 (concluding that district court did not abuse discretion in dismissing federal declaratory judgment action with "numerous unresolved issues in common" with underlying state action); *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp. 2d 348, 354-55 (E.D.N.Y. 2006) (declining to exercise jurisdiction over indemnification claim where "a determination of the insurers' respective

liability exposure" would be "theoretical" and "might be made moot by a finding of non-liability in the state court action"); *Fed. Ins. Co. v. Garner*, No. 15-CV-184(DAB), 2016 WL 3554929, at *7 (S.D.N.Y. June 20, 2016) ("The declaratory judgment action regarding the duty to indemnify . . . has many unresolved issues in common with the Underlying Actions . . . . Accordingly, the Court dismisses the indemnification portion of the declaratory judgment action as premature." (citations omitted)).

## Conclusion

For the reasons set forth above, the court orders as follows:

(1) Lighton's motion for leave to file an amended Local Rule 56.1 statement is GRANTED;

(2) Allied's objection to Lighton's amended Local Rule 56.1 statement is OVERRULED, and Mt. Hawley's motion to strike the amended Local Rule 56.1 statement is DENIED;

(3) Hibuild's motion for partial summary judgment is GRANTED in its entirety, as it seeks summary judgment only on the issue of Mt. Hawley's duty to defend it in the Tunkara Action;

(4)   Lighton's motion for summary judgment on the issue

of Mt. Hawley and Allied's respective duties to

defend it in the Tunkara Action is GRANTED, and

Lighton's motion for summary judgment on the issue

of indemnification is DENIED;

(5)   Allied's motion for summary judgment is DENIED in

its entirety;

(6)   Mt. Hawley's motion for summary judgment is DENIED

in its entirety; and

(7)   Hibuild's indemnification claim against Mt. Hawley

and Lighton's indemnification claims against Allied

and Mt. Hawley are DISMISSED without prejudice as

premature.

The dismissal of the indemnification claims by Hibuild

and Lighton is without prejudice to plaintiffs' ability commence

a new action seeking indemnification at the appropriate time.

The Clerk of Court is respectfully directed to enter judgment in

favor of Hibuild that Mt. Hawley is obligated to defend it, and

in favor of Lighton that Mt. Hawley and Allied are obligated to

defend it, in each case in the underlying State Court action,

*i.e.*, the Tunkara Action, and in any other proceeding seeking to

impose liability on Lighton and/or Hibuild as a result of

Tunkara's alleged fall from a ladder on August 16, 2014.  The

Clerk of Court's judgment shall further dismiss Hibuild and

Lighton's indemnification claims without prejudice and, following entry of judgment, the Clerk of Court is respectfully directed to close these consolidated cases.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 28, 2018

                            _____/s/_____
                            KIYO A. MATSUMOTO
                            United States District Judge
                            Eastern District of New York